Case number 2013-6004, Donna W. Sherwood et al. v. Tennessee Valley Authority. We're going to have to exceed 15 minutes per side. Mr. Vowell for the appellant. May it please the court, my name is Don Vowell representing the appellants. Now of course we're here in this case on summary judgment, so I want to talk about the facts and I also want to talk about this so-called administrative record. Now we've got several issues. The first one is the question is there any evidence in the record that this is a major federal action with significant environmental impact? The second issue is there any question of disputed fact that this so-called administrative record really is the administrative record? And when I say that I mean is it the administrative record of this 15-foot rule, which is the rule that TVA implemented? Doesn't that kind of beg the question whether this is a new rule on their part? Oh it does. That's very much a part of the question. I would just suggest I think you would have to establish that they did implement a new policy or a new rule in order for your characterization there to be valid. And I would like to just go right to that. The question of, you know, the Judge Varland says, oh there's nothing new. There's nothing new here. This is a continuation of the old. We have these old guidelines, you know, from 1997. We've got these guidelines and there's really nothing new here. This is a continuation of the old guidelines and we've got these people operating in the field who have made discretionary, simultaneously, all of the different tree cutters for TVA coincidentally and simultaneously decided to cut down virtually all of the trees in the right-of-way, 15,900 miles right-of-way, for the first time in TVA history. So I'd like to address that by going first of all to this guideline, which is right here. It's 18-2. And, you know, the key thing about that, or one of the key things about that, is this is not even a public document. It had nothing like environmental review. You know, how can it have something to do with NEPA when it isn't even a public document? It's never passed. So there was obviously no environmental review in 1997 and obviously no, as TVA admits, no environmental review today of the 15-foot rule. And it says right here, an internal publication of TVA not to be reproduced or quoted for publication without permission. And then the judge, if you look at it a little bit deeper, a little bit deeper. Does this document refer to the 15-foot rule? It does not. There's probably no TVA document. I took the thrust of Judge Kethlett's question to be, what did the agency actually do? And you're saying they established a 15-foot rule. Did they? Yes. Well, where is it in the record or in the allegations or wherever that there is such a rule? The 15-foot rule is, one of the best places to see it is in the statements of TVA counsel. In court one day, this is document 90. Document which? Page 55. 90. Like 89-90. The court says, so what's really changed here? And so TVA counsel, not the ones that are here today, but he says, well, what has changed with respect to the buffer zone is this 15-foot rule. And so this is, you know, that's why we, they call it the 15-foot rule, which simply means they're going to cut down every tree that is either 15 feet tall or could ever reach 15 feet. So the 15-foot rule. And what this means, according to their own document, is it wipes out, quote, virtually all, end quote, of the trees in the right-of-way because there's obviously no real trees that have a mature... I'm trying to get at, because I want to ask the opposing counsel what the record is for the particular decision you're challenging. I'm trying to get at where in the record is the particular decision you're challenging. It can't be in the transcript because that happened after you brought suit. I mean, there must be something that tipped you off that there's something that you're challenging. That's the problem. They say this is the administrative record of this decision. I'm not asking that question. I'm asking the question, what is it that you're challenging? Not what did they do after you brought the challenge. What is it that you're challenging? That's the whole problem, Your Honor. Well, you should know what you're challenging when you bring suit. They should, there's this 15-foot rule. Usually if you have an administrative record of something, there is a decision that you can say, well, here's the decision right here. It's right here. And they had a hearing and they thought about it. I understand that. You say they don't have that. What do they have? It must have been something that caused you to come into court. Well, they started cutting down everybody's trees. And what it was… Did they mark 15-foot when they cut down the tree? Well, they just cut them all down. If you look at the pictures that we filed, you can see that there's nothing left after they applied the 15-foot rule. They cut them down pursuant to their program and then they give you the record that goes with the program. I can see why they might be confused if you just come into court and say you're cutting down my trees. I thought you were cutting into court challenging this interpretive rule of 15 feet. Yes, but I don't know… How do you know that it exists when you sued? I don't know, because they told us. They came and sat with us. Where did they tell you? In the living room of the Sherwoods. Is that in the record? Yes, it's in one of the affidavits. It's in the affidavit of Jerry Penn, one of the plaintiffs. But they… That's really the problem I've had with this case is we said, so where is this decision made? Where is it to do this? I'd like to hear them answer this question. Yes, but I'm going to ask them, but they're going to say there is no such decision. And you say I can't find it and they say it doesn't exist. What's the court supposed to do? There's no decision to talk about. Maybe you're identifying this decision somehow. I thought there were your brief sites, notices saying we have a new policy and stuff like that. That's not in the record? That's in the record. Where is it? I was going to do that first. That is 29-5. This is the TVA website. Why has TVA… Why TVA has changed the way it manages vegetation in its transmission rights of way? Now this is a public announcement. This is not them making… This is not a body sitting and making the decision. Pardon? Which exhibit? 29-5. If this is not them sitting and making a decision, this is them announcing the decision. So that's why I have trouble with where is the administrative record for this decision because there is no administrative record for this decision. What you're saying is they have themselves characterized their action here as some change. Yes. It is a very meaningful change on the ground, literally. Meanwhile, they've withheld from you, in your opinion, the record of that change. Yes. We think this is about the date they published it, March of 2012. I can't prove that because we didn't get any discovery. Is there anything else? I see that TVA has changed its ways. Then you can go to 23-8, which is the Deer Landowner letter. This is the letter that they give you when they come to your property to cut down virtually all of your trees. And it's not by its terms limited to one of the 13 areas that they divided into? No, Your Honor. No. It just says, Dear Landowner, TVA and its contractors are now exercising TVA's right to clear virtually all trees located in TVA easements. TVA announced publicly many, many times, and for example, this is 21-27. It's an article where they're quoting the TVA official who was in charge of this one area where we live. The new policy of fully exercising that right is valley-wide, he said. This is Jason Regg. And will affect all seven states where TVA owns transmission power towers. Now is that, is there some question as to what you're reading now is in the record? No, Your Honor. That's 21-27. What about the things that the court said would not be considered as part of the record? Oh, that issue. Well, this was in the record long before all that supposed, you know, this is... I'm asking when the district court made its decision that some things are going to be in the record and some things aren't. Was this 21-27 in or out? I can't remember. Okay. I can't remember, but probably out. I really don't remember because it has to be, what the judge said is it had to be in existence at the time of the ruling. We don't have, you know, this was like after they, not after they made, after they made the decision. This was after they made the decision. This was after they started cutting the trees. This is just evidence you're asserting shows that the decision was made. Yes, and that it was new. You know, it certainly seems like a new policy. One thing that I've sort of puzzled over in this case is, I mean, on the one hand, you say this is a major action and you point out, I mean, the ground that they're clearing here, I guess, is equivalent to half of the Smoky Mountains National Park. On the other hand, they say, well, that doesn't matter because we have this categorical exclusion. And in your view, you know, where does this categorical exclusion come from within the text or regulations of NEPA? And what is their latitude to just sort of proclaim that they fall within it? Well, the categorical exclusion is, you know, they, that, you know, there's a few categorical exclusions. And the one they're using, it's a NEPA regulation where it lets you write up a categorical exclusion. And if it falls into that, then you just sweep it off. And you don't really have to think about it anymore because you've done it a hundred times before. And the one they're relying on is the one for routine maintenance. Okay. All right. And so if it's routine maintenance, you know, it's, there's no reason to do an environmental impact statement, obviously. Well, the guy that did this categorical exclusion checklist, they call it, his name is John Hardiman. He checked, this is 122-2, page 2 of 1000. He checked off this box, is it major in scope? And he said no. He didn't even know they had implemented this 15-foot rule. He didn't even know that they were, had a project going that would cost $159 million to cut down virtually all the trees in the right-of-way. So, and, you know, there's the question of, is this routine maintenance? And so the question then becomes, how can it be routine maintenance to cut down vast numbers of 100-year-old trees? How is that routine? How is spending $159 million in excess of your usual budget over a period of four or six years, how is that routine maintenance? Well, that's a good question. And I would like to hear opposing counsel answer that when they come up. So, you know, and when did they make this decision? I think that's kind of important. I think they made it in 2010. The reason I think that is because this is document 50. This is the declaration of the TVA official, Jason Rigg. I guess that's the same one I mentioned earlier. Consequently, beginning in fiscal year 2010, TVA has begun providing, or TVA began providing right-of-way specialists with additional funds to clear most of the taller trees within the full width of the right-of-ways. So we learned from Mr. Rigg that this is not a decision of, it's not a discretionary judgment by all these, coincidentally made by all these right-of-way specialists across the region. It's a central budget decision that they made at TVA. And maybe this is where the, you know, maybe this is the... You just don't know. Yeah, but maybe this is it. I mean, this is as good as anything. Let's ask him. Thank you, Your Honor. Thank you. Good morning, Your Honors. Maria Gillen for Appali Tennessee Valley Authority. May it please the Court, there are two issues before you. I'm sensing that the property issue is not of keen interest for oral argument, so I'll just rest on our briefs for that one. If you have any questions, of course, I'll answer them gladly. So the National Environmental Policy Act issue. I suggest to you that the whole 15-foot rule issue is a bit of a deflection. That's what they're challenging, though. That is what they're challenging, but... If you have a good answer to it, it would make sense to respond to it. Okay, I shall. It's not the issue. I shall. The NEPA claim is, did TVA do an adequate review under NEPA of its line-clearing activities? No, of the 15-foot rule. Well... That's their claim, right? That's their claim. Unfortunately, there is no 15-foot rule. Well, surely there was some change. I mean, we have, it seems, an undisputed change on the ground, where either you had a dormant policy that is now awakened with a vengeance, or you have a new policy. I mean, perhaps it's just semantics, but there is a change in what the agency is doing when it's taken down 100-year-old trees all across the state and spending $160 million. So, I mean, isn't that what matters here, that the agency is doing something different, and that's what he's challenging? Yes, Your Honor. As the district court did find, the clearing and the line-clearing guidelines had been consistent for 15 years. And I just want a slight diversion to the categorical exclusion, because there were questions about that. And the terminology, categorical exclusion, sort of suggests and has connotations of a throwaway. This is far from that. TVA started in the 30s and the 40s, transmission lines all over the Tennessee Valley, clearing, erection of it. And so we've been doing this for three or four decades before NEPA was enacted. Then in 1980, with CEQ notice and comment, CEQ approval, we enact our categorical exclusions. This is one of them, because we do it every year, annually, we have to, it's routine. And so all of our three decades of experience is undergirding this categorical exclusion. Would you agree that in order for this, let's call it activity, neutral term, in order for this activity to fall within the categorical exclusion, it has to be routine maintenance. Is that fair? Correct. The actual CE is routine maintenance, operation, and upgrading, actually. I noticed it this morning, of TVA facilities. And are those terms, routine maintenance, et cetera, are they defined simply in the agency's description of the CE categorical exclusion? Or is that somehow bounded by a regulation or a statute? It is, so categorical exclusion... Where would I find the definition of routine maintenance if I wanted to find that? And say, and be able to measure whether this activity falls within it? It probably is in the Federal Register notice that enacted the categorical exclusion. I reread that just this week, and... Do you have that cite by any chance? I do, 45 Federal Register 54511, and that is where we proposed our categorical exclusions. Minimal, it was notice and comment rulemaking, minimal commentary, and the one comment that they definitely addressed was how to do with uranium mining. Why, in your view, does this activity, which one way or another does seem to be, it's certainly alleged to be a very significant change in the agency's practice, how is that significant change within the definition of routine maintenance, in your view? So the routine maintenance has a backstop, which is what all of those ARCEC checklists, which is also a bad terminology, is supporting that exclusion. And what that does is it ensures that there are no significant impacts to the environment. Well, I'm not sure if that's responsive. Okay. What I'm asking for is what does routine maintenance mean, in your opinion, and why do you think this fits within it? The routine maintenance of our transmission lines must be done, and Mr. Dowell is right, it's 15,900 miles, must be done every year in order to ensure the safe transmission of electricity. Trees that get too close, fall, arc, disrupt power, cause outages, fires. So it is routine in our business to make sure that our lines are safe. But couldn't one argue, and I think this case, I mean, this was a 12B6 dismissal, right? The property was a 12B6, and the NEPA, it's sort of a misnomer to call it a summary judgment, but it was for judgment on the AR. All right. So, I mean, couldn't one argue that given what seems to be the reality, that this was a significant change in the agency's practice, that it's therefore not routine? Well, we get the idea that there's ways in which it might be answered one way or the other. Well, all I can say about that is that the activities, the activity itself, clearing the line was routine, and the thoroughness, and looking at the checklists, you see how thorough it is. Could I ask a question that's a little bit different, but sort of? Okay. I'm not satisfying Judge Ketledge, I'm afraid. No, that's, you know, we're trying to work through this. No, go ahead, John. The difficulty I have with this case is it seems to be the parties are talking past each other. Yes. They seem to focus on the change, and the change they identify in policy, as opposed to how many trees you're chopping down, which they point out, which is the subject of what Judge Ketledge is talking about. But the change in sort of decision-making is this 15-foot rule. And you stand and say, well, there is no rule. But in your brief, you say the new 15-foot rule is analogous to the one presented to this court in Michigan v. Thomas, where we reviewed a clarification of a regulatory term to determine whether it was an interpretive rule or a legislative rule. Well, an interpretive rule is a rule. Okay. You can't say an interpretive rule is not a rule. It's a kind of rule. So if there's an interpretive rule, which you literally say is the case here, then there's a new interpretive rule. Where, opposing counsel says, is the rule. To answer, there is no rule, it just sounds like we're talking past each other. It's like, you want to talk about the new rule, it's an interpretive rule, so let's talk about our annual policy of cleaning up. But you have these things that he points to in the record. It took a while to find them, but they're right there in the record, where it says TVA has changed the way it manages vegetation. You say, well, that's a clarification. Is there a clarificatory interpretive rule? You talk about it as if it exists. Is there? It either exists or it doesn't. Yes or no? There is an interpretive clarifying rule or there is not? It is a clarification of the term low-growing that was in our line-clearing guidelines. Who clarified? It is. What is the it? The things that he points to. So what are they? When it says this is just a website that says TVA has changed, who did the changing? The policy was always the policy. Low-growing trees were allowed in the buffer zones. Low-growing was never defined adequately. It was never defined where? It was never defined anywhere? Correct. In the line-clearing guidelines. Adequately. With you so far. NEPA reviewed covered right-of-way edge to right-of-way edge. I'm asking where the change is. After the NEPA reviews finished, the line-clearing men on the ground are given discretion, according to how much money they have to do it, which is never enough, as to which is the most triage, what is the most dangerous tree that we've got to get rid of here. That exercise of discretion was long. When it says TVA has changed its way, that's sort of a global view of what hundreds of different people monitoring, or dozens of people monitoring various parts of the TVA have just sort of collectively come up with? I would suggest that those... I want to know what's in the record. If I can... Who's the central decision-maker here? I don't think it's Mr. Hardiman, right? That's what I'm asking. He's implementing a policy that somebody else made, and I think what Judge Rogers is frustrated about, and what's kind of puzzling for all of us, is where the heck is this policy? Where is the central decision that is the subject of this lawsuit? Because we're seeing a lot of evidence that it exists, but we're not seeing the decision itself. I believe the impetus for the more rigorous implementation of our existing guidelines was a change in a FERC rule. Was from what? FERC, the Federal Energy Regulatory Commission. FERC. Requiring... Plot thickens here, I'm just kidding. But when you say the impetus, which is interesting, and as he says, the plot thickens. The impetus, but I want to know the impetus for what? What is it? Sorry, excuse me. A more rigorous interpretation of only low-growing trees. Who made that more rigorous interpretation? It was probably the head of the line-clearing, the system line-clearing people. If he wants to challenge that decision by this person that you're not even sure who it is, if he wants to challenge it, he's got the right to challenge it. I don't doubt that you have lots of good reasons for why that's to be upheld. You can say it's within his discretion, or what he did when whoever he is made this decision, it didn't have a sufficient impact, or it's an outgrowth of whatever arguments you want to make. That could get litigated if we could identify what that decision was, and you could create a record which supported that decision. Instead, what appears to be is you come in with a record for other decisions that are related. But what he's challenging, or what he purports to challenge, maybe it's not...we don't know. But he says, this is a change in the way, which had an impetus, which had a reason, and I would like to challenge it because I think it was probably illegal under NEPA. It would seem like the district court, to answer that question, instead of answering some other question, would say, okay, what's the decision? Give me the record for that decision so you can show me what went into that decision, and then we can evaluate whether it's a kind of decision that is whatever the requirements under NEPA are. NEPA says certain kinds of decisions you need, and EIS and others you don't. Do you see what I'm saying? That would make sense, but the way they did it, I just don't understand it. I do see your point, Your Honor, and I think it's getting muddled between rulemaking under APA and environmental analysis under NEPA. Right, that's why I think the whole idea that whether it's an interpretive or a legislative rule is not before us. It's the question of whatever it is, assuming it's an interpretive rule or a legislative rule, I know that there was an earlier part of the litigation where that was raised, but that was thrown out for some reason and it's not before us now. But it seems to me that an interpretive rule might have significant impact. And if it does, it might be something that NEPA applies to. On the other hand, there's probably some good argument you have for why it doesn't apply, and so we should look at how they decided whether to apply it or not and review that instead of reviewing something else. Are you with me? I am, Your Honor, and I appreciate your frustrations. This case, I came into it at the appellate level, and it zigged and zagged and zigged and zagged. And that's fine. Maybe would it make sense then, given that candor, which I appreciate, would it make sense for us to send it back and have... I know that's not the answer you want, but I'm wondering if it would make a certain amount of sense consistent with the goals of your agency to be open and to let people know what you're doing to have you create or gather an administrative record which supported whatever this change was, whatever it was. Get all the stuff in the record. I mean, I give you credit, or at least assume provisionally that it was a well-thought-out decision or at least a defensively thought-out decision. It would be more satisfactory to the system to say that rather than to say some other decision was okay. Right. Just, I know I'm at red, but... Yeah, please, respond. So the way TVA, a government agency, carries out its transmission of electricity and all the things that are involved in that is a discretionary and is not subject to judicial review. That is in our brief. I find that to be questionable, and it was not relied upon by the district court. Well, I think it was... The district court didn't rely on it in the decision that's being appealed here. Right, in the APA accounts it did. And I have thought about the whole... You know, if you want to say it's committed to agency discretion by law, I'd read the briefing, but it would be surprising to me. But that's not what we're reviewing. We're reviewing something which says the record supports what they did under NEPA, but it mischaracterizes what they did as one thing when they're challenging something else. Right? You see what I'm saying? That's the basis for the decision. If that's in error, why don't we just... Or misguided or misdirected, let's say. We don't even have to say misguided. If that's kind of a misdirected inquiry, why not send it back and have them do a directed inquiry towards the record for the decision that they're actually challenging? Well, and I did think about that, and I thought, well, now, what would be the record? And the record would be what we already did. Well, this makes me think, why don't we need some discovery? I mean, if the agency can't come up with it, let's give Mr. Vowell a chance to send you all his specific questions and requests and see what that generates. We can't decide a case when we don't have the rule, the action, whatever it is, at issue before us. I submit that you do. It's the line-clearing guidelines. It's the NEPA review. I do think you have the rule before you. It's as consistent as the district court found, but that's... But you understand what our concern is? I do. I just think it's a semantic difference that's putting NEPA into an APA hole, and I don't really think it's correct. Well, then I think you can argue that, but it would be easier to argue if we knew what the decision was. Okay. Other questions? Thank you for your answers and your candor. May it please the court. That's exactly the issue. We had discovery. So who made this decision? And when? Let me ask you this question. What is the status on the ground right now? I mean, the court denied a preliminary injunction, right? Chainsaws are running, presumably. They're running. How much of this has already been cleared? I mean, is this going to be an academic exercise by the time this is all... I mean, it'd be frustrating if we can't even get the rule itself or more than we have now before your ability to make a difference here goes away. It's the frustration that we've had. They've stalled us for like a year and a half. How long has it been? By not even telling us who made it and all that. So we've gone through this whole process in the trial court. You haven't asked for a stay or anything like that? Not from this court. Well, and if the panel decides to send the case back to the district judge, you can always renew your request for a PI, correct? I can. I would love to do that. I would love that opportunity. Discovery would be excellent. Discovery isn't really what review of agency action normally involves, but you can argue... But here they have this idea that they're like shifting around of what is the decision. We don't even know who made the decision exactly. We believe it was the 2010 budgeting decision. That's what they said. With the kind of focus that at least our court has addressed to this, you would think the agency would be able to come up with the documents that led to whatever decision there was? Yes. You would think so. That wouldn't necessarily be Discovery, but Discovery might work. Well, the truth is, I think we're going to find there is no administrative record of this decision. They just kind of did it probably... We just don't know. Let's not speculate. So... Anything else? I would add one point or two if I could. Well, one and a half. Okay. They do it every... I think I heard counsel say they do it every year. They don't do it every year. They never cut these trees down. Your time has expired now. Thank you, Your Honor. Thank you. The case will be submitted. Please call the next case.